MOISE, Justice.
 

 The curator-ad-hoc, in the exercise of his duties, resisted this suit and appeals from a judgment of expropriation, which adjudicated to the City of New Orleans for its uses and street purposes two certain pieces or portions of ground of the Girod Street Cemetery, situated in the First Municipal District of the City, for a consideration of $1.50 per square foot, or a total sum of $30,745.41 to be paid to Christ Church Corporation (Episcopal). This judgment contained the following condition:
 

 Title should pass to the City of New Orleans only after:
 

 1. The payment to Christ Church Corporation (Episcopal) of the sum of $30,-745.41.
 

 2. The registration of the judgment in the Conveyance Records of Orleans Parish.
 

 3. Disinterment and reinterment elsewhere of all the human remains presently interred therein, subject to the supervision and further orders of the Civil District Court for the Parish of Orleans.
 

 Giving a loyal allegiance and faithful service to the call of duty, the curator-adhoc also appeals from a declaratory judgment which:
 

 1. Condemned the Girod Street Cemetery and ordered its abandonment as a burial ground and prohibited its further use for burial purposes.
 

 2. Decreed that upon the disinterment and reinterment elsewhere of all human remains located within the Girod Street Cemetery, Christ Church Corporation (Episcopal) be decreed the owner in fee simple against the world, including the City of New Orleans, and all prior owners, their heirs, transferees or assignees, of the Girod Street Cemetery, together with all improvements, etc., thereon.
 

 3. Ordered that all human remains presently interred in the Girod Street Cemetery be disinterred and reinterred elsewhere, with perpetual care, withoüt any cost or obligation to the interested parties and relatives, except such 'as may be voluntarily incurred, at the cost and expense of Christ Church Corporation, all subject to the supervision and further orders of the Civil District Court for the Parish of Orleans.
 

 4. Reserved to each burial certificate owner the right to claim as. a personal rather than a real right any consequential loss or damage occasioned thereto, but limited to the cost of disinterment and reinterment elsewhere under like or similar conditions, depending upon the present state' of decay or depreciation of each such tomb,’ vault, or other burial place.
 

 The above judgments were in conformity with the petition of the City of New Orleans.
 

 
 *189
 
 Defendant, Christ Church Corporation, did not resist the expropriation, the request for a declaratory judgment, nor the order of removal. It acquiesces in the judgments.
 

 No appeal has been prosecuted by interested parties who filed interventions, and it is presumed that they have acquiesced in the judgments.
 

 The trial judge appointed a curator-adhoc to represent all unknown, absent and interested parties, other than the intervenors, who might be possible heirs, legatees, devisees, administrators, executors, or assigns of those who may hold or possess possible outstanding claims or interests in portions of the Girod Street Cemetery in compliance with Article 56 of the LSA-Civil Code which reads:
 

 “If a suit be instituted against an absentee who has no known agent in the State, or for the administration of whose property no curator has been appointed, the judge, before whom the suit is pending, shall appoint a curator ad hoc to defend the absentee in the suit.”
 

 The curatorTad-hoc assigns the following errors to the trial court’s judgments:
 

 1. In holding that the City of New Orleans had the right to expropriate cemetery property for street widening purposes.
 

 2. In fixing the value for expropriation purposes at $1.50 per square foot.
 

 3. In holding that the City could demand removal of the cemetery to another location by virtue of its title reservation and/or by virtue of the cemetery’s constituting a public health menace.
 

 4.In holding that title to the cemetery property became vested in the Christ Church Corporation rather than in the holders of the plot certificates, the City of New Orleans, or in the vendors of the property to the City of New Orleans.
 

 A discussion of the history of the cemetery is proper before discussing the curator’s allegations of error.
 

 The City of New Orleans acquired the land, which has been used as the Girod Street Cemetery, on March 22, 1821 from Marie Ursule Moquin, wife of Francois Marie Perilliat, Jr. On September 7, 1822, the City transferred the cemetery plot to the Congregation of Christ Church Corporation (Episcopal), a religious corporation created by Acts, approved July 3, 1805 and May 2, 1806, of the Legislative Acts of the Territory of Orleans. The sale contained the following provision:
 

 “Unto the members of the said Congregation. and their successors, to use .and enjoy the tract of land presently sold as a Protestant Cemetery, until the Council of the City of New Orleans sees fit to change the location of this cemetery by virtue of its proximity to the city, pursuant to which the said Congregation can enjoy, use and dispose of the same as it sees fit in full ownership by virtue' of these presents.”
 

 
 *191
 
 The cemetery, located in New Orleans, Louisiana, in the Square bounded by South Liberty, Magnolia, Cypress and Perilliat Streets, is a large rectangular tract measuring approximately 593 by 200 feet.
 

 The City of New Orleans alleged that the cemetery was in an unsanitary condition and in a state of ruin- and decay. The record conclusively shows this to be true. The trial judge, after personally visiting the cemetery, aptly described the condition as follows:
 

 .“As early as 1840 and up to the present time vandals and theives have invaded and desecrated the Cemetery. Hundreds of photographs, historic writings, and the testimony of Dr. Gardner, presently Head of the City Public Health Service, vividly describe the Cemetery as a nesting place for rats and vermin, the proving ground of ghouls who broke into vaults and tombs in search of dental gold and jewelry; graves stripped of copings and stones and iron metal work; inscriptions on marble tablets long since worn away by time and weather; crumbling tombs and vaults; vines and honeysuckle and other Louisiana wild vegetation completely covering the tombs; fig trees grown in thickets so dense as to block passage; oleander shrubs rooting in the most unlikely places; brick vaults five and seven tiers high, with the lower row sunk out of sight and covered with tangled carpets of vines; hundreds of the marble tablets covering the entrance to the vaults removed or their engravings completely obliterated; and in some instances the bones of the dead lying in their open graves exposed to the gnawing rodents and hungry vermin.”
 

 The following description of the cemetery as contained in the book, “Gumbo Ya-Ya,” compiled by Lyle Saxon, Edward Dreyer, and Robert Tallant, published in 1945, is quoted from defendant’s brief:
 

 “The oldest Protestant cemetery in New Orleans‘is the Girod Cemetery. This is, without a doubt, the weariest graveyard in the world. The whole place seems to sigh perpetually; even the fig trees which grow within the grounds sag with hopeless acquiescence to time and neglect. Grass and weeds are knee-high, and grow abundantly on tombs and graves and in the walks. Thick wistaria vines twist and coil grotesquely about ovens, as if to .squeeze out the bones of the buried. And in many places skulls and bones are bleaching under the sun in dismal symbolization of decay and dissolution. Poe might have found inspiration in this morbid and macabre scene. A family of black cats add their bit to the sinister atmosphere, following visitors and purring and rubbing at their ankles, or sleeping lazily in the sun amid a miscellaneous collection of skulls and femurs.
 

 
 *193
 
 * .* * ' * * *
 

 “The Girod Cemetery was at one time troubled with ghoulish thieves, who stole iron and brass from the tombs, and carried off flowers and shrubs. Both sexes seem to have been suspected, for the Crescent City Weekly, May 2, 1841, reprimanded them in this fashion. * * *
 

 “Girod Cemetery reflects in a small ■ way what all New Orleans graveyards once were. In early days burials were all in the ground and were terrifying affairs. Caskets were lowered into gurgling pools of water and were sunk into pits of oozing mud. As often as not, the coffin would capsize as the water seeped within. Heavy rains or a storm would cast newly buried, half-decomposed cadavers to the surface.”
 

 Thus we have a logical conclusion of abandonment by relatives — abandonment by those whose obligation and duty it was to maintain the vaults in a proper state of repair. The wording of the cemetery deeds provide for such. So does section three of Ordinance No. 3174 of the Common Council of the City of New Orleans, approved December 26, 1856. The Church was in no way responsible for the upkeep of individual tombs, which had always been by private agreement between the sexton and the interested parties.
 

 In determining the right of the City of New Orleans to expropriate, the following law is applicable:
 

 “No graveyard or cemetery shall be expropriated unless the court finds' that the route of expropriation cannot be diverted from that proposed by the plaintiff without great public loss or inconvenience.” LSA-R.S. 19:3.
 

 “Municipalities and parishes may expropriate and otherwise acquire any private property, within or without their limits, for any of the purposes for which they are organized, and for any works that they are authorized to own or operate, or which they are authorized to lease or donate to the United States. * * *” LSA-R.S. 33:4621.
 

 An examination of the testimony of the City Engineer and the Director of the Planning Commission of the City of New Orleans shows that the particular portion o.f land herein involved is vitally' needed for street purposes. We are convinced that' the expropriation cannot be diverted from that proposed by plaintiff without great loss and inconvenience. LSA-R.S. 19:2(1); LSA-R.S. 19:3; City of New Orleans v. Crawford, La.App., 9 So.2d 82; Motion adopted by the Commission Council of the City of New Orleans, July 30, 1953, providing for the expropriation of the instant property.
 

 The. curator-ad-hoc argues that public: policy and good morals require that an area once dedicated as a cemetery should remain so dedicated and should not be expropriated.
 

 
 *195
 
 In the case of Humphreys v. Bennett Oil Corporation, 195 La. 531, 197 So. 222, 229, we stated:
 

 “Regardless of the laws and rules relating to the ownership and control' of real property, when a plot of ground-is set apart for cemetery purposes, and burials are made in the land, the ground changes. its character in the minds and, feelings of the community. ‘It assumes a sacred quality that overrides conveyancers’ precedents and requires free-, dom from profanation until, by abandonment and removal of the bodies or by complete disintegration, there remains nothing to appeal to the emotions of the survivors.’ ”
 

 We believe that there are reasons why- property which has been dedicated and used for public purposes does not become so dedicated in perpetuity. Particularly is this true when the ground so dedicated has become an abuse rather than a holy use. The expropriation of a cemetery for the use,, comfort, welfare and health of the living is not unreasonable, unnatural, impolitic or unjust. Choppin v. Dauphin, 48 La.Ann. 1217, 20 So. 681, 33 L.R.A. 133; Duplantis v. Chauvin, 182 La. 281, 161 So. 610; Reichelt v. St. Vincent De Paul Cemetery Association, 10 Orleans App. 100.
 

 We again quote from the reasons for judgment given by the learned judge of the Civil District Court:
 

 “It is suggested that, because a cemetery is the resting place of the dead, under no circumstances should it ever be disturbed for any purpose. In [Re] Board of Street Opening, 133 N.Y. 329, 31 N.E. 102 [103, 16 L.R.A. 180], the Court held:
 

 “ ‘We certainly cannot be sure that the lawmakers, if they had known of this cemetery, disused for burials for 50 years, and never more to be used for that purpose, located in the midst of a dense and teeming population, would have preferred that it should remain appropriated for the resting place of the long since dead rather than that it-should be devoted to use for the comfort, welfare, and health of the living. We cannot say that the taking of such a cemetery for such a use is such an unreasonable, unnatural, impolitic or-unjust thing.’
 

 ******
 

 “So the dead under such circumstance must give way to the living, and in the process of time their sepulchres may become the seats of cities, traversed by thoroughfares and trodden by the living. While such places are under the active and tender care of the living and devoted to pious uses, they should be treated as hallowed ground and be permitted to remain untouched; but-under the necessity of public health, convenience or safety, the dead must give way to the living.”
 

 In the case of In re Board of Street Openings and Improvements, etc., 133 N.Y.
 
 *197
 
 329, 31 N.E. 102, 104, 16 L.R.A. 180, the court stated:
 

 “There is no law which prohibits the removal of human remains from a cemetery for lawful purpose and placing them elsewhere.”
 

 In the case of United States v. Sixty Acres, More or Less, of land in Williamson County, Ill., D.C., 28 F.Supp. 368, 374, we find the statement:
 

 “It is true, and universally recognized, that cemeteries and grounds for the burial of the dead are sacred places entitled to respect and to public and private defense against unwarranted trespass and invasion. Indeed, .eyery' civilized state, including Illinois, has laws, both civil and criminal, calculated to protect these homes of the dead from invasion and desecration. Nevertheless, both on principle and authority, the law seems to be that the use of a tract of land as a public cemetery or private burial ground cannot preclude the taking thereof by state or nation by power of eminent domain for a necessary public uie or by a state in the reasonable exercise of its police power, even though such taking may require the removal of the bodies. Scanlan’s Treatise on The Law of Church and Grave, p. 458; Am. & Eng. Enc. of Law (2d ed.) Col. 5, p. 783; 6 Cyc. 715; 14 C.J.S., Cemeteries, § 25, p. 85; Bessemer Land & Improvement Co. v. Jenkins, 111 Ala. 135, 18 So. 565, 56 Am.St.Rep. 26; Partridge v. First Independent Church, 39 Md. 631, 637; In Matter of Board of Street Opening, etc., 133 N.Y. 329, 31 N.E. 102, 16 L.R.A. 180, 28 Am.St.Rep. 640; Campbell v. Kansas City, 102 Mo. 326, 13 S.W. 897, 10 L.R.A. 593.”
 

 We see no need to discuss the contention that $1.50 per square foot was not a sufficient valuation for the property. The undisputed testimony is that $2.00 a foot is the value for the highest possible use. For the purpose here involved, both the City and the Church have agreed to a price of $1.50 per square foot for the 20,496.94 square feet to be taken. All remains will be reinterred elsewhere with perpetual care, thus imposing no monetary loss upon those the curator-ad-hoc represents.
 

 The third assignment of error is that the City could not demand removal of the cemetery to another location by virtue of its title reservation and/or by virtue of the cemetery’s constituting a public health menace.
 

 The act of sale by which the City sold the property to Christ Church contains a stipulation that the City Council reserved the right to change the location of the cemetery. Burial certificates read as follows:
 

 “The Rector, Wardens and Vestry of Christ Church, in New Orleans, duly Incorporated by an act under date of the 3d July, 1805, Hereby Sell, Convey
 
 *199
 
 and Transfer, with full warranty and subrogation of all such title and right, but none other than said Christ Church now has in the Cemetery now called the ‘Girod Street Cemetery,’ all that certain Lot No. * * * in Square No. * * * to be by him and his Heirs, Executors, Administrators and assigns, enjoyed, held, used and possessed, in absolute fee-simple, forever. Provided, nevertheless, That the said * * * Heirs, Executors, administrators and assigns,
 
 shall at his and their own cost and risk, comply with any and all Municipal Regulations of this State, Parish and City of New Orleans, now existing or which may hereafter he duly enacted'in reference to this Cemetery,
 
 and that neither said * * * nor any one of his Heirs, Executors, Administrators or Assigns shall ever, under any pretense, sell, convey, or transfer, use or employ said Lot of Ground for any other purpose than the Interment of the Dead * * * and if this proviso should be at any time violated, then ipso facto the said Lot, in whosesoever hand the same may be found, is to revert and belong, free of any charge for indemnity, to the said Christ Church, whp may, without any other formality than a Resolution of the Vestry, re-enter and take possession of said Lot * * * and the same at pleasure use and enjoy, or resell, re-transfer and reconvey.” (Italics ours.)
 

 All parties herein involved, under the above deeds and stipulations, were apprised of the conditions of the sales. The City in its proprietary and governmental municipal capacity has chosen to exercise its power of expropriation which had been previously acknowledged by contract.
 

 “The ownership of tombs and burial lots is acquired under such regulations and subject to such conditions as may be prescribed by the owners of the cemetery, and are not subject to the general laws, relative to the transfer of real estate.” Petit v. Depass, 5 La.App. 40; Syllabus by the Court.
 

 In the case of Reichelt v. St. Vincent De Paul Cemetery Association, 10 Orleans App. 100, the Court stated:
 

 “For though termed a lease, the distinctive feature of such a contract is that of a deposit.
 

 “When the vault has received the body it is sealed until time and nature have accomplished their office. And all that the'parties have in contemplation is that the body shall remain therein undisturbed during the time specified; and for this the cemetery association is responsible.”
 

 It is urged that the original contract of sale to the City of New Orleans contained a resolutory condition. Articles 2013 and 2045 of the LSA-Civil Code. The curator-ad-hoc relies upon the following condition:
 

 
 *201
 
 “ín full ownership to the said honorable mayor, aldermen and inhabitants of New Orleans to hold, enjoy and dispose of the said tract as full owners, provided it suits them to establish there a cemetery, by virtue of these presents.”
 

 To support his contention, the curator-ad-hoc cites the case of Board of Trustees of Columbia Road Methodist Episcopal Church of Bogalusa v. Richardson, 216 La. 633,
 
 44
 
 So.2d 321. In that case, which involved a donation, we held that a donee of land was bound to execute the charges imposed on him by the act of donation.
 

 In the instant case, we have an outright sale of property for a cash consideration. The act of sale recited that the vendee intended to use the land for cemetery purposes. No perpetuity was attached to the purpose which was carried out by the vendee. No statement was made that the condition was mandatory. We agree with the trial judge that the condition was permissive and precatory.
 

 It was with a prophetic eye that the poet of the day saw the dawning of a great transitiori period, and so he exclaimed to the world to ring out the old and to ring in the new. The old has been rung out, and the new rung in by keeping in step with progress and development. We cannot allow any determent of expansion by a beating of the living with the bones of the dead.
 

 For the reasons, assigned, the judgments the Civil District Court for the Parish of Orleans are affirmed.
 

 HAMITER, J., concurs in the decree.
 

 McGALEB, J., recused.